## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UPMC,<br><br>      Plaintiff,<br><br>v.<br><br>HIGHMARK, INC. and WEST PENN ALLEGHENY HEALTH SYSTEM, INC.,<br><br>      Defendants. | CASE NO. _____<br><br>Related to Case No. 2:09-cv-00480-JFC |

## COMPLAINT

## INTRODUCTION

1.  Plaintiff UPMC brings this action against Defendants Highmark, Inc. ("Highmark") and West Penn Allegheny Health System, Inc. ("WPAHS") under Sections 1 and 2 of the Sherman Act, 15 U.S.C §§ 1, 2.

2.  Through a course of conduct over more than a decade, Highmark has monopolized the provision of health insurance in Western Pennsylvania, monopsonized the purchase of health care provider services, and impaired competition in the provision of health care services.

3.  One element of Highmark's scheme has been an illegal agreement to divide geographic markets among it and the 37 other health insurance companies offering Blue Cross and/or Blue Shield insurance plans. Highmark has been able to insulate itself successfully from insurance competition in Western Pennsylvania as a result of this horizontal division of markets.

4.  Since its inception in 1996, Highmark has waged a crusade to cripple UPMC as a provider of healthcare and of insurance products in order to preserve Highmark's health

insurance monopoly.   Following the bankruptcy of AHERF (Allegheny Health, Education and Research Foundation) in 1998, a major part of Highmark's crusade has been its relationship with WPAHS.  By its own admission, Highmark created WPAHS with its initial round of financing. Highmark's prime purpose for WPAHS has not been to enhance competition among healthcare providers, but rather for Highmark to have a presence in the provider market that could be used to maintain its insurance monopoly.   The result has been a rash of anticompetitive behavior by Highmark, WPAHS, and others they have enlisted to preserve Highmark's dominant position in insurance.   This behavior has included, but is far from limited to, a conspiracy between Highmark and WPAHS to favor WPAHS in compensation over UPMC, in exchange for which WPAHS has not contracted with any outside insurers on terms more favorable than Highmark. Highmark has been able artificially to hinder UPMC's viability as a potential insurance competitor through its Health Plan by limiting its reimbursements to UPMC on the provider side, while at the same time preventing other insurance competition from entering or expanding in Western Pennsylvania.

5.     Most recently, Highmark has entered into an "Affiliation Agreement" with WPAHS devised to coerce long-term renewal of its contracts with UPMC and to exclude competition from outside insurers.  The objective has been to preserve Highmark's monopsony rates to providers, and to sustain the high barriers to entry which its insurance competitors have not been able to conquer to date.

6.     For at least two decades, hospitals in Western Pennsylvania have faced daunting challenges.  Stagnant or declining population and the migration of many medical treatments from in-patient settings to out-patient settings have left many institutions starved for both patients and

revenues.   Overcapacity, that being too many hospital beds for the number of available admissions, has been rampant in the region.

7.      This region-wide phenomenon has provided Highmark with great market power as a dominant buyer of health care (or "monopsonist").   Because hospitals have desperately needed the patients Highmark could deliver, Highmark has driven down the reimbursement rates paid to those hospitals far below the rates paid for similar services in similar markets. Highmark's overall scheme of anticompetitive conduct has furthered this trend, ensuring that Highmark has not had to raise its reimbursement rates.

8.      This "monopsonist pricing" could have been a boon to the region's consumers of healthcare if Highmark had passed the savings along to its subscribers.   But it has not done so. Lacking any effective competition in the insurance market, Highmark has in fact increased premiums while hoarding the excess in reserves, which are now greater than $5 billion. Highmark is thus a "monopsonist" as a buyer of health care from providers, as well as a "monopolist" as a dominant seller of insurance plans to consumers.

9.      Highmark has also, by its own admission, been "ineffective" at controlling utilization of healthcare and at collaborating with providers to develop new, more cost-efficient models of care, resulting in additional costs to its subscribers.   It could get away with being ineffective only because it faced little competition in the market for health insurance, particularly competition for "national" accounts.

10.     Since at least the mid-1990s, Highmark has recognized that the major threat to its monopoly/monopsony was a strong UPMC and its upstart Health Plan.   It therefore began what has become a 15-year, wildly expensive, and only marginally successful campaign to mute competition from UPMC.

11.     In the course of this campaign, Highmark enlisted and conspired with a number of separate entities and persons, including WPAHS, other Blue Cross and Blue Shield plans (through BCBSA) and a variety of "consultants."

12.     This continuing conspiracy and campaign has cost UPMC and the citizens of Western Pennsylvania perhaps billions of dollars over the years, dollars that went into Highmark's bloated reserves or into the pockets of its co-conspirators. Only in the past year has the prospect of real competition in both the market for health insurance and the market for health care services begun to emerge, and only because UPMC has managed to withstand the latest salvos fired at it in this illegal campaign.

13.     This Court's intervention is necessary to remedy the harms to competition which have resulted from Highmark's and WPAHS's conduct, described in further detail below, and to compensate UPMC for the great damage already done. The anticompetitive conduct must also be brought to a halt, necessitating an award of appropriate equitable relief.

## PARTIES

14.     Plaintiff UPMC is a 501(c)(3) not-for-profit corporation organized under the laws of the State of Pennsylvania with a principal place of business in Pittsburgh, Pennsylvania.

15.     Defendant Highmark Inc. is a non-profit corporation organized and existing under the laws of the State of Pennsylvania with a principal place of business in Pittsburgh, Pennsylvania.

16.     Defendant WPAHS is a 501(c)(3) not-for-profit corporation organized under the laws of the State of Pennsylvania with its principal place of business in Pittsburgh, Pennsylvania.

## JURISDICTION & VENUE

17.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C.

§§ 1331 (Federal Question Jurisdiction) and 1337(a) (Antitrust) because the causes of action

asserted herein arise under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and Section

16 of the Clayton Act, 15 U.S.C. § 26.

18.     This Court has personal jurisdiction over Defendants Highmark and WPAHS as

they have ongoing and continuous contacts with this judicial district.

19.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because

UPMC, as well as Defendants Highmark and WPAHS, maintain their headquarters in this district

and a substantial part of the events or omissions giving rise to the claims asserted herein occurred

within this judicial district.

20.     The conduct alleged herein was committed in and affected interstate commerce.

## RELEVANT MARKETS

21.     The provision of commercial health insurance is a relevant product market.

Health insurance is essential to accessing healthcare, as very few individuals can afford the risk

of financing health services on their own to any significant degree.  Government-financed health

insurance programs for the Veteran's Administration health system and Medicare/Medicaid are

not included in the product market for purposes of this litigation.  Those programs have specific

eligibility requirements based on age, income, veteran status, and other factors, and are not

accessible to the ordinary consumer of health insurance services.  Nor do these programs provide

a meaningful competitive constraint on the market for commercial health insurance.

22.     There is no adequate substitute for commercial health insurance available to

businesses and individual consumers.  Commercial health insurance is so important that the

Patient Protection and Affordable Care Act requires all individuals to purchase a minimum level of insurance coverage beginning in 2014.

23.     The provision of Medicare Advantage plans is an additional relevant product market.   The provision of Medicare Advantage plans constitutes a market separate from the provision of commercial health insurance plans because Medicare Advantage is available only to individuals who are disabled or elderly.   Those who qualify for Medicare Advantage would not find it cost-effective to switch to commercial health insurance.   Thus, Medicare Advantage insurance is not a substitute for commercial health insurance.

24.     Medicare Advantage is also distinguished from other government-financed health insurance programs, such as Medicare and Medicaid.   It constitutes a separate relevant product market because the rates for Medicare Advantage are negotiated between each insurer and provider, rather than set by the government.   As a result, the terms of Medicare Advantage can be much more beneficial for consumers.   (Hereinafter, the term "relevant insurance markets" refers to both the markets for the provision of commercial health insurance and the provision of Medicare Advantage plans.)

25.     The provision of inpatient hospital services ("inpatient services/care" or "provider market") is also a relevant product market.   Inpatient services consist of inpatient surgical, medical, and supporting services provided in a hospital setting to patients.   This market excludes outpatient services.   The choice of inpatient, as opposed to outpatient, services is largely determined by physicians, and is based on the medical needs of the patient, not on the relative cost of the services.   Thus, inpatient services and outpatient services are not substitutes.   The relevant product market, however, is no narrower than all inpatient services.

26. The purchase of health care provider services by insurance companies on behalf of commercial insureds is another relevant product market. Generally speaking, patients do not purchase services directly from healthcare providers. Patients purchase commercial health insurance products from health insurance companies, which purchase services from healthcare providers.

27. Another relevant product market is the purchase of provider services by insurance companies on behalf of Medicare Advantage insureds. Those who are eligible for Medicare Advantage do not purchase services directly from healthcare providers. Eligible patients purchase Medicare Advantage products from insurance companies, which purchase services from healthcare providers. (Hereinafter, the term "relevant purchase markets" refers to both the markets for the purchase of provider services by insurance companies on behalf of commercial insureds and the purchase of provider services by insurance companies on behalf of Medicare Advantage insureds.)

28. The relevant geographic market for each of the relevant product markets is Western Pennsylvania, which includes Allegheny, Armstrong, Beaver, Bedford, Blair, Butler, Cambria, Cameron, Clarion, Clearfield, Crawford, Elk, Erie, Fayette, Forest, Greene, Indiana, Jefferson, Lawrence, McKean, Mercer, Somerset, Venango, Warren, Washington, and Westmoreland counties. Healthcare markets are generally regional as, for most types of treatment, consumers only travel a limited distance to obtain the services they need. Although for many subspecialties, the geographic markets are far broader, Western Pennsylvania is the appropriate geographic market for addressing the claims in this Complaint.

## FACTS

### I.   HIGHMARK'S DOMINANCE

29.   Highmark currently holds in excess of 65% of the market for the provision of commercial health insurance in Western Pennsylvania.  It holds in excess of 50% of the market for the provision of health insurance through Medicare Advantage plans.

30.   Confirming Highmark's dominance of the relevant insurance and purchase markets, news reports have indicated recently that major national insurers were "cautious" about entering the Western Pennsylvania health insurance market due to Highmark's market dominance.

31.   This monopoly position has enabled Highmark to exercise monopsony power over healthcare providers.  UPMC has been forced to contract with Highmark at such low reimbursement rates that it had no choice for many years but to charge higher rates to all other insurance networks in order to remain in business.  Highmark's monopsony power, artificially maintained by the overall course of anticompetitive conduct including its conspiracy with WPAHS, has discouraged entry into the relevant insurance markets by potential Highmark competitors.

32.   Highmark's creation and artificial propping up of WPAHS as a provider, detailed below, has contributed to Highmark's ability to maintain its insurance monopolies.  The creation and support of WPAHS has enabled Highmark to limit reimbursements to UPMC, while at the same time preventing entry and expansion from other insurance competitors.  Those constrained reimbursements to UPMC have hindered its ability to emerge as a competitor in the insurance markets through its Health Plan.

-8-

33.     Barriers to entry into the relevant insurance and purchase markets are high. National insurers have not been able to secure a significant foothold in the relevant insurance or purchase markets to date. In addition, the population of Western Pennsylvania is declining, so there is an increasingly smaller population of potential insureds. Thus, the significant investment required to establish a foothold in the market is becoming less attractive over time.

34.     Highmark has the power to control prices on insurance premiums in the relevant insurance markets. Due to its monopoly position, employers and individuals have paid steadily increasing insurance premiums to participate in Highmark plans.

35.     This power to exclude competition and raise prices demonstrates that Highmark has monopoly power in the relevant Western Pennsylvania insurance markets. Highmark also has monopsony power in the relevant Western Pennsylvania purchasing markets, where reimbursement rates have remained at subcompetitive levels since Highmark's formation.

36.     By both extracting monopoly prices from consumers and their employers and extracting monopsony rates from healthcare providers as a result of its anticompetitive agreements, Highmark has accumulated in excess of $5 billion in reserves.

## II.     HIGHMARK'S ILLEGAL MARKET ALLOCATION

37.     Highmark has long been a member of the Blue Cross Blue Shield Association ("BCBSA"), a trade association which was created by and for its constituent members. The BCBSA is not and has not been in a vertical relationship with its member plans. It is a creature of the member plans themselves, who are actual and potential competitors in the relevant insurance and purchasing markets. Through the structure set up by Highmark and the 37 other member plans through the BCBSA, the member plans themselves have agreed to allocate territories for the purposes of insulating themselves from competition.

38.     This market allocation scheme is one part of Highmark's overall scheme to protect itself from competition in the relevant insurance and purchasing markets.  The result has been artificially to maintain the monopsony rates it has been able to pay to providers like UPMC, as well as preserve the monopoly premiums it has been able to charge to healthcare consumers in Western Pennsylvania.

39.     Blue Cross plans have provided coverage for hospital services, while Blue Shield plans have provided coverage for physician services.  The first Blue Cross plan was established in 1934 and used a blue Greek cross as its symbol.  Soon thereafter, other hospital plans around the country began to use the same symbol to signify that their plans met certain similar hospital services coverage standards.  Initially, the various plans using the Blue Cross symbol were not affiliated with one another.

40.     In 1939, the Blue Shield symbol (a blue shield) was created.  Although the blue shield symbol was designed to indicate that the Blue Shield physician services plans were distinct from the Blue Cross hospital plans, the Blue Shield plans were companions to the Blue Cross plans and meant to offer complementary coverage.

41.     In the 1940s, the Blue Cross plans and the Blue Shield plans formed respective national organizations.

42.     In the early 1980s, those organizations merged to form the BCBSA.  The BCBSA was formed by and among its member plans and, through the BCBSA, the member plans agreed among themselves to maintain exclusive service areas.  Any failure to abide by the market allocations would result in the termination of the BCBS entity's license to use the Blue Cross and Blue Shield trademarks and trade names.  Each member plan remains an independent entity in competition against the other plans.

43.    In 1994, the BCBSA abandoned its longstanding rule that Blue Cross and Blue Shield plans must be not-for-profit entities.  This rule change led to Blues across the country converting to for-profit status.

44.    As a result of mergers amongst various Blue Cross and Blue Shield plans within the BCBSA, there are 38 Blue Cross and Blue Shield constituent member plans.

45.    By the 1990s, BCBSA member plans had 37.5 million enrollees.  By 2003, that number had climbed to more than 88 million.  By 2009, it reached 100 million.

46.    By the design of the BCBSA's members, a member plan may operate only under the Blue Cross or Blue Shield trademark or trade name if it first obtains a license from BCBSA. Thus, each of the BCBSA member plans has entered into a BCBSA License Agreement.  By agreement of the member plans, each of those BCBSA License Agreements is substantially the same.

47.    As the owner of a member plan, Highmark has entered into a License Agreement with the BCBSA.  By Highmark's and the other member plans' design, this License Agreement gives Highmark the exclusive ability to use the Blue Cross and Blue Shield trademarks in Western Pennsylvania.  Similarly, upon information and belief, each other member plan has agreed not to compete under the Blue Cross or Blue Shield trademarks except in its designated territory.

48.    This licensing structure has not been the case of a licensor independently deciding how to license its intellectual property among various potential licensees.  Rather, the member plans created the BCBSA and its licensing structure, and thus have been imposing upon themselves the territorial restrictions encompassed by each Licensing Agreement.  Accordingly,

this has been a horizontal arrangement between actual and potential competitors, rather than a vertical restraint imposed by an independent entity.

49.     In prior litigation, the BCBSA has taken the position that it has no legal identity outside of its members.  This is further confirmation that this has not been a series of vertical relationships, but rather a horizontal restraint imposed by and upon its own competitors.

50.     According to the Government Accountability Office: "The [BCBSA] license agreement restricts plans from using the trademark outside their prescribed service area to prevent competition among plans using the Blue Cross and Blue Shield names and trademarks."

51.     In prior litigation, BCBSA has admitted the existence of territorial allocation agreements between and among its members, and at least one court has taken notice that the pattern has existed for many years.

52.     The BCBSA License Agreements have effectuated a naked horizontal territorial allocation by and among BCBSA and the member plans.

53.     These explicit, horizontal agreements to divide various geographic health insurance markets within the United States, including the agreement by and among the member plans to license the Blue Cross and Blue Shield trademarks in Western Pennsylvania exclusively to Highmark, have reduced competition and resulted in fewer health insurance choices for Western Pennsylvania residents.  They have also reduced reimbursements to providers of healthcare services to commercial and Medicare Advantage health plan insureds.

54.     Each of the Blue Cross and Blue Shield member plans has possessed and continues to possess at least a significant market share, and in certain cases a dominant share, in the provision of health insurance for commercial and/or Medicare Advantage members in their designated regional markets.  Each member plan has also possessed at least a significant market

share, and in certain cases a dominant share, in at least one of the purchasing markets in their designated territories.  In the absence of the horizontal restraints the member plans have imposed on each other, the potential and actual competition represented by the other member plans would have disciplined both the premiums each member plan could charge consumers as well as the reimbursements it could have demanded, and continues to demand, from providers.

55.     This illegal conspiracy to divide markets and to eliminate competition has extended beyond the use of the Blue Cross and Blue Shield plans.  Many of the Blue Cross and Blue Shield affiliates have developed non-Blue Cross or Blue Shield branded plans and products that could compete in Western Pennsylvania.  However, on information and belief, there has been an express or implied understanding among the BCBSA plans to avoid or at least reduce competition against one another even on non-Blue products.  But for the agreements not to compete against one another, these entities could and would have used their non-Blue brands to compete more effectively with Highmark throughout Western Pennsylvania.  That would have resulted and continued to result in greater competition, higher reimbursements for providers, and lower premiums for subscribers.

56.     These horizontal restraints have not been and are not reasonably necessary to effectuate any alleged benefit arising from the license of the Blue trademarks and trade names.  If the member plans sought to license the Blue trademarks and trade names, that could be accomplished by means other than agreements not to compete.

57.     These horizontal agreements are per se violations of the antitrust laws.

58.     These agreements have caused increased prices for health insurance, diminished reimbursements for providers, and decreased output in health care broadly.  If not condemned per se, therefore, they are nevertheless unlawful under the rule of reason as the resulting anti-

competitive effects dramatically outweigh any claimed pro-competitive effects from their existence.

### III.   HIGHMARK'S CAMPAIGN TO CRIPPLE UPMC

59.   Highmark's ill-gotten gains from the illegal market allocation conspiracy have helped fund Highmark's campaign to cripple UPMC.

60.   In 1998, in response to strong arm tactics from Highmark and significantly depressed reimbursement rates, UPMC announced its intention to become an Integrated Delivery and Finance System (IDFS) offering both provider and insurance products.   The insurance products were to be offered through the UPMC Health Plan.   The UPMC Health Plan has been and remains a "narrow network" plan.   That is, to achieve the necessary cost savings, the plan covers only those services provided by select in-network providers.

61.   The principle purpose of an IDFS, an innovative and bold concept in 1998, is to integrate provider and insurance offerings so that consumers are offered the highest quality care at the lowest cost possible.   Since UPMC's creation as an IDFS, the IDFS concept has gained national recognition as a leading approach to healthcare solutions.

62.   The creation of the UPMC Health Plan was also an attempt to increase insurance competition to the benefit of consumers and UPMC providers.   The UPMC Health Plan currently offers commercial insurance and Medicare Advantage insurance products.

63.   The UPMC Health Plan represented and continues to represent potential competition to Highmark's monopolies in the relevant insurance markets.   Should consumers and businesses find that the (already inflated) premiums they were paying to Highmark exceeded their willingness to pay for such services, the narrow network UPMC Health Plan would provide an alternative.

64. Rather than welcome the prospect of this increased competition from UPMC and offer consumers better products to counter it, Highmark instead embarked on a strategy aimed at avoiding competition and crippling UPMC. One component of this strategy has been its long-term conspiracy with WPAHS and, more recently, a consultant retained by Highmark.

65. The purpose of Highmark's strategy, at this early stage, was to maintain its monopoly over the health insurance markets by ensuring that UPMC's IDFS could not be viewed as a viable alternative to Highmark's insurance products. This strategy had multiple prongs, spanning contracting, steerage, legal, public relations, and acquisitions.

66. Some examples of Highmark's proposed conduct implementing this strategy included: directing referrals away from UPMC; increasing a patient's co-payment when he or she chose a UPMC facility; publicly disparaging UPMC as an IDFS by questioning its financial model, its methods of delivering health care, and the individuals running UPMC; drawing parallels to failed institutions; vigorous auditing of hospitals and physicians; substantially lowering the price of certain Highmark products and recouping such losses through other Highmark products; and implementing underwriting policies that restricted the abilities of insurance rivals to offer competing health plan products to employees.

67. Upon information and belief, these are not the only methods Highmark had employed artificially to cripple UPMC as an IDFS. It is important to understand that acts Highmark has taken to undermine UPMC as a provider, whether to discourage consumers' use of the system or to lower its credibility in the public eye, have been for the purpose of preventing UPMC's emergence as a stronger insurance competitor through its Health Plan that would pose a threat to Highmark's insurance monopoly.

## IV.   HIGHMARK'S INITIAL AFFILIATION WITH WPAHS

68.     Highmark created WPAHS out of the bankrupt AHERF health system.  Highmark provided a subordinated loan of $125 million to support the WPAHS-AGH merger, with promises of additional aid going forward.  As Highmark itself put it:  "[G]reat efforts were made to preserve AGH . . . .  With significant financial support from Highmark in the form of a $125 million loan, WPAHS and Suburban General Hospital combined with AGH and other former AHERF hospitals to form [WPAHS].  This loan made it possible for WPAHS to '[rise] from the ashes' of the failed AHERF."

69.     Highmark's initial loan and further promises of aid were furthered by an agreement between Highmark and WPAHS to discriminate in the compensation Highmark would pay to UPMC by giving WPAHS more favorable financial treatment.  In exchange, on information and belief, WPAHS agreed not to contract on more advantageous terms with other insurers in order to prevent their successful entry into Western Pennsylvania.

70.     Highmark's primary purpose in creating WPAHS was to establish a vehicle to protect and maintain its insurance monopolies.  The favoring of WPAHS over UPMC gave Highmark leverage over UPMC to marginalize its Health Plan and to reinforce Highmark's insurance monopolies.  Since WPAHS's formation, it has never been a competitively viable provider, but rather a tool through which Highmark has sought to preserve its dominance.

71.     WPAHS has served as a front line vehicle for anticompetitive behavior by Highmark.  Highmark's claims that its support of WPAHS is for the primary purpose of enhancing competition among providers are false.  WPAHS has never served as a meaningful competitor on the provider side due to mismanagement and inefficiency, but rather has served as Highmark's vehicle through which to protect itself from insurance competition.  Through the

-16-

conspiracy, Highmark and WPAHS have been able to foreclose competition from both UPMC's Health Plan, as well as outside insurers who might seek to enter and/or expand.

72.     Highmark has preserved its market position, as a result of the conspiracy, by hindering UPMC's Health Plan as an insurance competitor, and by raising barriers to entry to other Highmark insurance rivals who would otherwise seek to enter or expand.  So long as Highmark could starve UPMC of resources on the provider side by favoring WPAHS, UPMC's ability to emerge as a significant insurance competitor would be stunted.  Highmark knew and continues to know that if it deprives UPMC of resources on the provider side, it will preclude competition from UPMC's Health Plan.  UPMC's expansion as an insurance competitor through its IDFS is dependent upon market-driven reimbursements on the provider side, to which UPMC has been denied pursuant to the conspiracy.

73.     A key part of this conspiracy initially was the establishment and aggressive marketing of an insurance product, "Community Blue," that excluded coverage at UPMC facilities.  The purpose of Community Blue was to steer patients away from UPMC and towards WPAHS's providers.  If UPMC did not comply with Highmark's demands on the insurance side, then Highmark could market Community Blue more aggressively, depriving UPMC of volume and enriching WPAHS.  On information and belief, Community Blue was unprofitable.  Its simple purpose was to siphon patients away from UPMC and towards WPAHS.  Highmark and WPAHS understood that the creation of this plan was pursuant to Highmark's agreement to favor WPAHS over UPMC on the provider side, so that Highmark would not face meaningful competition on the insurance side.

74.     Highmark's internal strategy also reflected its agreement with WPAHS. Specifically, its plan was to "aggressively market and sell CommunityBlue" to steer patients to

its then "unofficial" affiliate, WPAHS.   It was clear that Highmark viewed UPMC as a competitor and enemy.   One Highmark memorandum stated that: "UPMC is not our ally and is not neutral . . . .   Therefore, they are a competitor."   Thus, both WPAHS *and* Highmark saw UPMC as an enemy, and their agreement aimed to target UPMC for their mutual gain.

75.     Former Highmark CEO Ken Melani even acknowledged that the purpose of its combination with WPAHS was to siphon patients away from UPMC.   Q&A with Dr. Kenneth Melani, Pittsburgh Post-Gazette (Jan. 2, 2008) ("WPAHS Allegheny, for as much aggravation as they may pretend we've caused them, they wouldn't be around if it weren't for us").   The more successful that initiative was, the more invulnerable Highmark's insurance monopolies would be.

76.     Both parties upheld their end of the conspiracy.   On Highmark's side, as it told this Court, it provided "continuing support for WPAHS throughout the past decade."   This "continuing support" included:

- "[A]mendments to the 1996 Agreements [in 1999] . . . provid[ing] for increased rates and an annual index adjustment" coincident with its $125 million loan to support WPAHS's formation;

- "[F]urther amendments to the 1996 Agreements [in 2002] including new increased rates . . . retroactive to . . . 2001";

- "[A] $42 million grant to WPAHS in 2002 . . . [a purpose of which was] to support physician recruitment activities of WPAHS;" and

- Further contract amendments between 2002 and 2008, in which "specific reimbursement rates were increased . . . [including] a $1.5 million grant for the recruitment and retention of anesthesiologists and nurse anesthetists at AGH."

Over the same time span, UPMC received nothing in the way of similar reimbursement rate increases or contract reopeners.   As discussed below, Highmark's agreement with UPMC in 2002 provided for frozen reimbursement rates for up to 10 years, with adjustments only for

inflation.   While UPMC's rates remained stagnant, WPAHS was given regular reimbursement rate increases so as to favor them in the provider market.

77.     Highmark's discrimination in favor of WPAHS has resulted in the artificial propping up of an inefficient and incompetently managed provider, WPAHS.   WPAHS has essentially been a reprise of its failed predecessor, AHERF, and its prime mission has been to exert whatever pressure it could on UPMC for Highmark's benefit.   In the end, this has resulted in inefficient excess capacity in the provider market.   Consumers have had to pay for that inefficiency through increased healthcare costs.   The harm has been exacerbated by gross mismanagement of WPAHS since its creation, leading to massive financial losses fueled by Highmark's largesse.   Had Highmark not intervened and allowed market forces to play their normal role, the level of inefficient excess capacity in Western Pennsylvania health care would be far less serious.

78.     Compounding the inefficiency, in 2007, WPAHS re-financed its $125 million loan, repaying Highmark in full with the proceeds even though Highmark had written down the value of the loan four years earlier.   That refinancing, however, was based on misleading financials.   Subsequently, later WPAHS financial statements have been the subject of an investigation by the Securities and Exchange Commission.   The effect of the conspiracy, then, has been to add inefficient excess capacity and, apparently, to mislead investors into supporting that activity.

79.     Moreover, under the terms of the refinancing, the bondholders could not rely on Highmark to bail WPAHS out should WPAHS not meet its debt covenants.   Also, WPAHS only had to meet those covenants once a year, as opposed to twice a year as was the case for its previous debt.   Thus, not only were investors exposed in this deal, but Highmark also managed

to rid itself of financial obligation to WPAHS. Highmark could thus continue to utilize its co-conspirator as it saw fit, without even having to take on significant financial risk.

80.     On WPAHS's end of the conspiracy, upon information and belief, it aided the effort to hinder the UPMC Health Plan and also gave no outside insurer more favorable rates than Highmark. As a result, the ability of Highmark's insurance competitors to penetrate the market was significantly hampered.

## V.     THE 2002 UPMC-HIGHMARK AGREEMENT

81.     As 2002 approached, UPMC's hospitals remained in-network under Highmark insurance plans pursuant to contracts executed in 1996. The 1996 contracts provided for extremely low reimbursement rates, and to the extent there were rate increases for a given year – and for certain years there were none – they did not keep pace with inflation. This was despite massive increases in costs, creating a situation that threatened UPMC's viability. Because of the conspiracy to divide markets, UPMC did not have the option of seeking agreement with any other BCBSA plan.

82.     In 2002, the two parties negotiated towards new agreements but reached an impasse. Bowing to intense community pressure, however, UPMC eventually agreed to a new set of contracts in June 2002 covering its then-existing facilities and related services. Subject to various differing terms as to termination dates and terminability, the agreements generally had durations of ten years, with a one year run out period.

83.     These agreements include, *inter alia*, the provision and payment of hospital services provided to subscribers of Highmark's commercial products at UPMC Presbyterian Shadyside, UPMC Northwest, UPMC St. Margaret, UPMC Passavant, UPMC Horizon, UPMC Bedford, and UPMC McKeesport. In the same general time period, a series of contracts were executed between UPMC employed physicians and UPMC physician groups and Highmark

governing the provision of physician and professional services to Highmark's subscribers. For simplicity, these agreements are referred to hereafter collectively as the "2002 Agreement." (These agreements do not include certain physician contracts as well as the contracts for UPMC Children's, UPMC Mercy, and UPMC Hamot, which were negotiated on a separate timeline and will expire on dates after June 30, 2013.)

84.     The 2002 Agreement was highly favorable to Highmark. Although the 2002 Agreement granted UPMC a modest single-digit reimbursement rate increase over the then existing subcompetitive reimbursement rate levels, it also froze those rates – apart from general inflation – for the duration of the Agreement.

85.     Notably, the 2002 Agreement did not put an end to the Highmark-WPAHS conspiracy. Rather, it created a 10-year backstop which Highmark could use to ensure that WPAHS was receiving better compensation. Indeed, as explained above, over the length of the 2002 Agreement Highmark regularly increased WPAHS's reimbursement rates, while UPMC's rates remained stagnant so as to inhibit the emergence of its Health Plan. Highmark's offers to UPMC regarding compensation were not merely the product of market forces, but were artificially influenced because of Highmark's agreement with WPAHS. Indeed, the conspiracy did not end with the 2002 Agreement, but rather made the Agreement possible and enabled the conspiracy's anticompetitive effects to continue.

86.     Highmark's strategy to cripple UPMC was enhanced by the 2002 Agreement. Highmark viewed the Agreement as a potential mechanism through which to enforce and maintain its monopoly power. UPMC was forced to capitulate to Highmark's demands for a long-term contract that kept UPMC's reimbursement rates stagnant, other than adjustments for inflation, for ten years. At bottom, this was because there was no viable insurance alternative,

including UPMC's IDFS offerings, to challenge Highmark's monopoly. Highmark also knew that, as a result of this agreement, UPMC would not receive the reimbursements it would need to fund a significant insurance competitor.

87.     From UPMC's perspective, an unintended and unwelcome effect of the 2002 Agreement was to inhibit entry by other insurers. Because the rates paid by Highmark to UPMC were so low, UPMC could not afford to charge the same rates to outside insurers. In other words, UPMC was forced to use its rates with the outside insurers as a way to make up for the subcompetitive rates it was being paid by Highmark. Because the reimbursement rates the outside insurers had to pay were much higher than those Highmark had to pay, their plans were much more expensive than Highmark's. This prevented the outside insurers from successfully expanding in the market for health care insurance in Western Pennsylvania. This lack of expansion came to the attention of the Department of Justice, which opened a formal investigation in 2007 of Highmark and UPMC. That investigation was closed in 2011.

## VI.    THE HIGHMARK-WPAHS CONSPIRACY CONTINUES

88.     Both before and after the 2002 Agreement, Highmark gave routine reimbursement rate increases to WPAHS pursuant to their conspiracy. Those reimbursement rate increases were in no way reciprocated to UPMC, as its rates remained stagnant from 2002 to this very day, apart from adjustments for inflation. By design, this hindered the growth of UPMC's Health Plan and precluded the ability of outside insurers to expand.

89.     Highmark's generosity was not quite enough for WPAHS, however. To pressure further even greater favoritism, WPAHS filed a complaint against Highmark (as well as UPMC). In 2009, WPAHS's First Amended Complaint was filed and the two found themselves in the unusual posture of litigation adversaries. The lawsuit effected no withdrawal of either WPAHS or Highmark from their continuing conspiracy. Indeed, even in the midst of arguing to the

Supreme Court that it was being disadvantaged by Highmark, WPAHS, *at the same exact time*, was receiving financing of at least $50 million from its alleged enemy, as well as a $25 million advance which would "be used to offset future reimbursements" from an unnamed "commercial payor." In addition, in the then most recent WPAHS disclosure to bondholders for FY2008, WPAHS cited "contracted higher rates for commercial [i.e., Highmark] and governmental payors." Accordingly, Highmark's agreement to favor WPAHS over UPMC in terms of financial support has not waivered over the course of the litigation. Nor, upon information and belief, has WPAHS entered into any contract with an outside insurer with more favorable rates than it was receiving from Highmark over the course of the litigation. Indeed, these events affirm that, notwithstanding a federal lawsuit being brought between the co-conspirators, the larger goal of preserving Highmark's insurance dominance reigned paramount.

90.     While the conspiracy continued, Highmark sought to merge with Independence Blue Cross (IBC) for the purpose of further consolidating its monopoly power. That merger was later abandoned when Highmark and IBC were told by the Pennsylvania Department of Insurance that, in order to consummate the transaction, they would have to relinquish use of either the Blue Cross or Blue Shield brand.

91.     In October 2011, Highmark officially announced its intention effectively to acquire WPAHS through an "Affiliation Agreement" and, by adding provider services to its business, to become an Integrated Delivery and Finance System (IDFS) like UPMC.

92.     The announcement of this "Affiliation Agreement," complete with hundreds of millions of dollars of financing, affirmed the parties' status – collaborators in an effort to protect each other from competition, especially competition from UPMC. Still, despite Highmark's public statements that the "Affiliation Agreement" served to enhance provider competition, the

true purpose of the arrangement was to utilize WPAHS as a weapon to preserve its insurance monopoly.

93.    Highmark filed the "Affiliation Agreement" with the Pennsylvania Department of Insurance ("PID") along with a "Strategic Vision" document, which in essence told Western Pennsylvania consumers that they had been making the wrong health care choices by going to UPMC for care instead of WPAHS.    While Highmark would never publicly admit that it would force its insureds to use WPAHS going forward, the "Strategic Vision" not so subtlely hinted that it would "assist" its insureds to make the "right" health care choices.    This was an element of Highmark's agreement to favor WPAHS over UPMC.    In exchange, Highmark's long-time collaborator, WPAHS, would continue to refuse contracts with outside insurers that would put Highmark at a disadvantage.    This aimed to preserve the high barriers to entry which have existed for Highmark's national competitors.    Highmark and WPAHS sought to portray the "Affiliation Agreement" as the entirety of the agreement between the two, but the reality is that the parties' long-standing agreement to protect each other from competition remained, with re-vamped elements.    As explained further below, Highmark would threaten to steer its insureds to WPAHS's provider assets, to the potential benefit of WPAHS, if UPMC did not comply with Highmark's demands on the insurance side.

## VII.    THE CONSPIRACY CONTINUES WHILE HIGHMARK SOUGHT TO RENEW THE 2002 AGREEMENT

94.    As the 2002 Agreement began to approach its end of term, UPMC determined that a dramatic change of course was necessary.    Consistent with the views expressed by the staff lawyers at the Department of Justice, UPMC began negotiating with Cigna, HealthAmerica, Aetna, and United on a basis that would put all UPMC facilities in their respective networks at vastly lower "market" rates – *i.e.*, rates consistent with what insurers paid in other parts of the

country. These negotiations proved successful and, by mid-2011, agreements with all four outside insurers were reached. The move was a risky one. UPMC was agreeing to reduced reimbursement rates from the very insurers whose payments were keeping it afloat over the subcompetitive levels it has always received from Highmark. Yet unless those outside insurers are able to capture market share away from Highmark, the outcome for UPMC will be reduced payments without the potentially offsetting gains it might achieve if Highmark's dominance were eroded.

95.     Faced for the first time with a viable threat of insurance competition, Highmark struck back. In negotiating renewals of the 2002 agreements with UPMC, Highmark demanded a continuation of a rate structure that would preserve its cost advantage disparity as against other insurers. Armed with its new agreements with the outside insurers, however, UPMC resisted, taking the position that all insurers should pay equivalent market rates and that no insurer should be favored over another.

96.     Highmark then officially announced its "Affiliation Agreement" with WPAHS. Highmark's contracting game plan vis-à-vis UPMC was pursuant to its long-standing and continuing conspiracy with WPAHS. Namely, Highmark would threaten to steer all of its insurance subscribers away from UPMC to WPAHS if UPMC did not accede to its long-term contract demands. WPAHS continued to serve its role as a tool through which Highmark would seek to preserve its insurance monopoly.

97.     From UPMC's perspective, it was clear that regardless of the outcome of the contract negotiations, Highmark would, and was obligated to, favor WPAHS and any other provider assets Highmark was to obtain. Accordingly, in contract negotiations from 2011

through the beginning of 2012, UPMC reiterated its position that a final and certain separation from Highmark is necessary, and offers the best solution to the community.

98.     Nevertheless, Highmark has pushed on pursuant to its conspiracy, threatening to steer its patients to WPAHS if UPMC did not comply with its contracting demands.

99.     In this regard, Highmark threatened to forego potentially-profitable contracting arrangements simply to punish UPMC, and for the potential enrichment of its co-conspirator. For example, UPMC had offered to contract with Highmark for access to the UPMC East facility in Monroeville, Pennsylvania in order to maintain access for Highmark subscribers through June 30, 2013, the date that the one year run out period of the 2002 Agreement was scheduled to end. Highmark, by letter dated January 12, 2012, rejected such a contract, insisting instead on a long-term, system-wide contract.  The implication from Highmark was clear:  give us the long-term, system-wide contract we seek, or else we will steer all of our insureds away from UPMC East, and toward the directly competitive WPAHS facility, Forbes Hospital.  On February 21, 2012, Highmark even stepped up its threat, holding a press conference to announce that UPMC East would not be in-network for either Highmark's commercial *or* its Medicare Advantage subscribers.  In essence, Highmark was holding its Medicare Advantage insureds hostage in order to coerce an exclusionary contract with UPMC.

100.    The negotiation relating to the urgent care center ("UCC") at Washington Hospital, an independent hospital, tells the same story.  In November 2011 the UCC entered into a joint venture with UPMC.  For the four years prior, the UCC and Highmark had a profitable relationship.  As the newly formed joint venture triggered a change in the UCC's tax status, the UCC requested that its payers assent to the change going forward.  Although every other insurer consented, Highmark refused, contending that the parties' relationship "has been placed on hold

as part of the larger Highmark/UPMC discussions." The same tactic was being used: unless Highmark received the long-term contract it sought, it would steer all of its insureds away from the Washington UCC and toward WPAHS's directly competitive facility, Canonsburg Hospital.

101.    In March 2012, Highmark announced that neither its commercial subscribers nor its Medicare Advantage subscribers would have in-network access to the Washington UCC – the same tactic as had been used for UPMC East. When UPMC pointed out that these decisions, as to both UPMC East and the Washington UCC, could not be squared with its December 2011 assurance that Medicare Advantage patients would not be affected by the commercial dispute, Highmark left no ambiguity: It would address access for Medicare Advantage patients to UPMC East and the Washington UCC only "as part of the broader discussions of in-network access to UPMC community assets and services for all Highmark members." Highmark's implicit threats to steer its commercial *and* Medicare Advantage insureds to WPAHS if its contract demands were not met were made pursuant to its conspiracy with WPAHS.

102.    Highmark's refusal to renew its existing and profitable contract with the UCC at Washington Hospital could only be explained as an attempt to punish a UPMC business partner, to the benefit of WPAHS, as a means of coercing UPMC into an exclusionary contract. Highmark's refusal occurred only after learning that the urgent care center had become a joint venture between that facility and UPMC. Highmark executives confirmed with Washington Hospital that the reason Highmark refused to continue their relationship is that it would compromise its strategy vis–à–vis UPMC. Highmark also confirmed that it would agree to a contract with Washington Hospital if it was no longer associated with UPMC, and guaranteed referrals to Highmark's provider facilities.

103.    These threats confirm WPAHS's role in the marketplace pursuant to its relationship with Highmark:  its real purpose is not to compete with UPMC to provide the best healthcare to Western Pennsylvanians, but rather to serve as a bargaining chip for Highmark to utilize to preserve its insurance monopoly.  This explains at least part of the reason WPAHS has never provided effective competition in the provider space:  Highmark, by design, has kept WPAHS barely financially afloat to serve its anticompetitive purposes.

104.    Highmark's public statements as to WPAHS's debt obligations further confirm its intent to use WPAHS for whatever purposes it sees fit.  When asked about KPMG's auditing report that WPAHS may not be able to meet its debt covenants later this year, former Highmark CEO Ken Melani stated:   "With us involved, I guarantee they won't trip the covenants." However, the Affiliation Agreement provides that Highmark is not assuming WPAHS's debt and pension obligations.  Thus, the circumstances are clear:  as long as it serves Highmark's monopolistic purposes to keep WPAHS out of default, it will, but otherwise it has no legal obligation to do so.

105.    Upon information and belief, one of the Highmark executives who was behind the threats to Washington Hospital has been serving as a Highmark consultant for the last few years ("the consultant").

106.    Although the consultant carries the titles of Division President, Integrated Delivery System and Executive Vice President of Highmark, upon information and belief, he remains an independent consultant to Highmark and he and his companies are entities independent of Highmark.  Upon information and belief, the consultant has chosen not to be an employee of Highmark so that his various side companies, ventures, and partnerships do not run afoul of traditional conflict-of-interest rules.  Accordingly, in this capacity, the consultant has

served as an independent co-conspirator with Highmark and WPAHS in the threats to community hospitals such as Washington and Highmark's complementary provider strategy (discussed below) more generally.

107. Highmark's efforts at UPMC East and Washington, on information and belief, were made pursuant to its conspiracy with WPAHS and the consultant to disadvantage UPMC and coerce UPMC into a long-term contract. Highmark's further conspiracy with the consultant served to accomplish the threats to at least Washington for this purpose. The pressure tactics at these locations could not succeed but for the alternative of steering the patients in question to WPAHS's facilities. WPAHS's role has been essential in allowing Highmark's conduct to succeed.

108. UPMC East and Washington are not the only instances of coercive tactics Highmark and its co-conspirators have employed. A particularly egregious example has been Highmark's attacks on UPMC affiliates Chartwell Pennsylvania, LP and Great Lakes Healthcare Services. These entities provide home infusion therapy and other specialty pharmaceutical services. Conforming to industry standards, both entities have historically billed for infusions (intra-venous (IV) administration of medicines) and diluents (compounds used to dilute IV medicines) as separate line-items. Highmark reimbursed these items in this way for nearly two decades. On January 1, 2011, Highmark instituted a new policy requiring that charges for infusions and diluents be "bundled" into the "per diem" rate for home health services without raising the per diem rate, essentially eliminating reimbursements for these items. While Highmark notified other providers of the change and applied it prospectively to those providers, it never formally notified Chartwell or Great Lakes despite the fact that they were contractually entitled to 30 days' notice of the policy change. Indeed, Highmark continued to reimburse for

the separate line items throughout 2011, even where other billing problems required manual review of the bills. However, in August 2011, Highmark began a process that led to a demand for nearly $4.1 million from Chartwell and over $600,000 from Great Lakes in refunds for line-item payments on infusions and diluents. This not only includes payments made from January 1, 2011 forward (which would result from the improperly-implemented policy change), but also includes a demand for payments made in the past two years, well before any change in policy.

109.    UPMC has also been target of harassing audits under the existing contracts. During the first quarter of the 2012 fiscal year, Highmark issued nine audits of UPMC's physician services division (PSD) – an unprecedented number given that the normal number for a given quarter has been two to three since PSD's inception. Adding to this, three of the audits were raised on the same day in the same letter, a practice never seen before by UPMC. Two of these three audits were later acknowledged by Highmark staff to be baseless, and UPMC awaits a response from Highmark confirming the same for the third.

**Highmark's Complementary Provider Strategy**

110.    To step up its threats to UPMC, Highmark announced plans to invest at least $500 million in a new network of doctors, community hospitals, ambulatory care, medical malls and other out-patient locations – all in a market area with an excess of hospital facilities and a stable or declining population. The purpose was to further pressure UPMC into the long-term contract it desires by threatening to steer its insureds to these provider assets. This strategy has been spearheaded by the consultant and is a key component of the Highmark-WPAHS-consultant conspiracy.

111.    One acquisition Highmark made for this purpose was its deal with Premier Medical Associates ("Premier"), a 68-physician independent multi-specialty practice. Premier is

the "largest multi-specialty physician practice in the Greater Pittsburgh area offering specialties that include asthma/allergy/immunology, cardiology, family practice, gastroenterology, general and breast surgery, hospitalists, internal medicine, neurology, pediatrics, podiatry, radiology, and sleep medicine." Upon information and belief, Highmark paid in excess of $70 million for this practice.

112.    In addition, Highmark has also recently acquired an interest in MedExpress, which operates urgent care centers that compete with those operated by UPMC (either individually or in joint ventures with community hospitals).

113.    Upon information and belief, in furtherance of this initiative Highmark hired the Astorino architecture firm to do over $1.5 billion worth of design work on its medical malls and facilities.

114.    All of these acquisitions served to bolster Highmark's threat to steer patients if it did not get the long-term, network-wide contract it sought. These threats were by the design of Highmark's and WPAHS's conspiracy.

115.    Pursuant to the conspiracy, the consultant, in his role as Division President of Highmark's "Integrated Delivery System" (despite remaining an independent contractor), has asked a former UPMC physician to act as Highmark's "property bundler," to buy up, anonymously, property in specific suburban locations where Highmark will create new WPAHS surgical centers or medical malls, typically not far from an existing UPMC facility. Also, the consultant has been involved with Highmark's management of "ProtoCo PPI," a supply chain management company that was created to compete with UPMC's supply chain management company, "ProdiGo Solutions LLP." Upon information and belief, Highmark and the co-conspirator consultant have used these types of relationships as tools through which to demand

obedience from independent hospitals and providers so as to not do business with UPMC, in similar fashion as with Washington Hospital discussed above.

## VIII. THREATS TO PHYSICIANS, COMMUNITY HOSPITALS, AND OTHER NON-UPMC PROVIDERS

116.    In furtherance of the conspiracy to favor WPAHS in the provider market, Highmark former-CEO Ken Melani held a meeting in 2012 with WPAHS employed physicians as well as independent physicians with WPAHS privileges.  At that meeting, Dr. Melani made clear that, if the doctors took any action supportive of UPMC or adverse to Highmark (such as seeking UPMC employment or referring cases to UPMC), Highmark would jeopardize their economic well-being.   Again, WPAHS's participation was essential to the success of this strategy, as WPAHS is Highmark's provider alternative.   By Highmark's design, the true "benefit" from WPAHS's existence is not for patients to choose its providers on the merits, but for it to provide a viable threat to other providers who would otherwise be free to use UPMC.

117.    Upon information and belief, this is not the only example of such threats.  For example, Highmark's threats to the Washington Hospital pursuant to its conspiracy with WPAHS and the consultant also served to reduce competition on the provider side.  Highmark has also been acquiring real estate in close proximity to community hospitals, with the explicit or implicit intention of opening "medical malls" in their backyards.  Even the modest diversion of admissions that these malls would assuredly draw would leave these hospitals, which are already grappling with operating losses, declining inpatient use and reduced Medicare and Medicaid payments, in grave condition.  When confronted with such threats, the community hospitals have no option but to submit to Highmark's de facto control over them.

118.    As Highmark has remained the dominant insurer, Highmark has had ample power to make good on its threats both on the insurance side through reduced reimbursements in its

take-it-or-leave contract renewals, denials of coverage, slow pay tactics and future steering and now on the provider side as well via threats of parking Highmark/WPAHS doctors, medical malls or other Highmark/WPAHS facilities on the doorstep of noncompliant hospitals. Those threats on the provider side, fueled by a $1 billion commitment, would apply to providers' efforts to contract with the national insurers on favorable terms before those insurers have any real foothold in the market. Until that real presence is established, Highmark, along with its co-conspirator hold all the cards.

119. The effect of such conduct taken pursuant to the conspiracy has not only been to impair competition in the provider market, but also to prevent UPMC's potential competition in the insurance markets through its Health Plan.

## IX.   THE RECENT HIGHMARK-UPMC AGREEMENT IN PRINCIPLE

120. On May 2, 2012, UPMC and Highmark announced that they had reached an agreement in principle to provide for in-network access to all UPMC hospitals and physicians for Highmark commercial and Medicare Advantage members until December 31, 2014.

121. This agreement sets December 31, 2014 as the date certain by which the UPMC-Highmark commercial relationship will end save certain facilities, and for Highmark members in a continuing course of treatment at UPMC.

122. Highmark's and WPAHS's scheme is likely to continue notwithstanding the May 2012 agreement in principle. Highmark has made public its plans to re-introduce Community Blue, the narrow-network plan that excludes UPMC to WPAHS's benefit.

123. Also, upon information and belief, WPAHS chairman Jack Isherwood recently reported to WPAHS employees that, despite a 100 patient decline in admissions for the third quarter of FY2012, there was nonetheless a $24 million increase in net patient revenue for the same time period. The only plausible explanation for this event is an undisclosed rate increase

to WPAHS from Highmark, confirming that Highmark's and WPAHS's agreement as to discriminatory compensation still runs through the present.

## X.    THE EFFECT OF A COERCED LONG-TERM CONTRACT

124.    A primary purpose of the Highmark-WPAHS-consultant conspiracy, as well as Highmark's complementary provider strategy executed pursuant to it, has been to pressure UPMC into a long-term, system-wide contract which would both preserve Highmark's monopsony rates and maintain the high barriers to entry to outside insurers. This campaign of retaliatory and coercive tactics, including putting patients at risk by refusing to cooperate on an orderly wind down of the UPMC-Highmark relationship, has been designed to force UPMC to capitulate and to enter into an exclusionary long-term contract. The long-term contract desired by Highmark would continue to hinder UPMC's competitiveness as an IDFS by continuing to starve it of resources on the provider side, and deny Highmark's other insurance rivals of the scale they need to successfully enter and expand.

125.    That strategy has failed, at least for now. As discussed above, in May 2012, Highmark and UPMC came to an agreement that sets December 31, 2014 as the date certain for the end of the parties' commercial relationship (with specific pre-existing exceptions). The time between now and the end of 2014 provides the appropriate transition period to ensure that the needs of Western Pennsylvania healthcare consumers are met. And when the Highmark-UPMC commercial relationship ends on December 31, 2014, Western Pennsylvania healthcare consumers will benefit.

126.    By taking the bold step of announcing that it would allow its agreements with Highmark to expire at the end of 2014, UPMC's actions have presented the first opportunity for real competition in Western Pennsylvania health care insurance in a generation. Rather than the inertia of the same-old same-old combination of Highmark insurance and UPMC facilities, area

employers will enjoy real choices and opportunities. Once UPMC is no longer captive to Highmark, employers will be able to choose between (i) the integrated Highmark/WPAHS payer-provider system offering Highmark insurance and WPAHS/Premier facilities and services; (ii) the integrated system of UPMC facilities and insurance, or (iii) insurance from major national and regional insurers with both UPMC and WPAHS in-network. Faced with this wide menu of alternatives, the inertia that fuels Highmark's monopoly will finally subside and there will be a genuine opportunity for real competition.

127.     With this separation, in due time, Highmark will no longer be able to preserve its monopsonist rates to providers (including WPAHS), or its monopolist premiums to consumers.

128.     Highmark, however, appears reluctant to acknowledge publicly the finality of its recent agreement with UPMC. Highmark executive Deborah Rice has already told Highmark's subscribers that Highmark will try to continue the UPMC relationship beyond 2014, stating: "I want to stress that a multi-year contract agreement between Highmark and UPMC beyond 2014 is still a priority for Highmark." If Highmark can continue to make area customers believe that UPMC will be in its network indefinitely, the ability of outside insurers to attract customers will be thwarted.

## INJURY TO COMPETITION FROM HIGHMARK'S CONDUCT AND CONSPIRACY WITH WPAHS

129.     The harm to consumers that has resulted from Highmark's monopsony power over UPMC and its monopoly power in selling health insurance is palpable. Highmark's "Strategic Vision" document confirms that it has had the power to impose whatever premium increases it wants on subscribers so long as it maintains its position as the monopolist insurer. As Highmark admits in the document, "[i]n the last decade alone, health insurance premiums in [W]estern Pennsylvania have increased at a rate greater than 6% per year while wages and

salaries have only increased 2-3% per year." Were Highmark able to continue its relationship with UPMC beyond 2014, its ability to continue this trend would go unchecked.

130.    Highmark has engaged in a course of conduct that has improperly acquired and maintained its monopoly power in the relevant insurance markets.  It has also entered into agreements with other members of the BCBSA, WPAHS, and the consultant which serve to maintain its monopolies and unreasonably restrain trade in those markets, as well as impair competition in the relevant provider market.  While the following discussion identifies some of the harmful effects Highmark's and WPAHS's conduct has had in particular relevant markets, the law requires that this broad ranging scheme be viewed as a whole, such that its competitive effects be assessed in their totality.  Highmark's scheme, including its conspiracy with WPAHS and others in coordinated fashion, has harmed and continues to harm competition, consumers, and UPMC.

## HARM TO THE RELEVANT INSURANCE MARKETS

131.    Highmark's market allocation agreements by and among it and the 37 other Blue member plans have served artificially to reduce the number of insurance competitors in Western Pennsylvania.  But for the exclusion of those competitors from the relevant insurance markets, the variety and output of insurance plans would have increased, and premiums charged to consumers would have been lower.  In addition, reimbursements paid to Western Pennsylvania providers would have been higher in the absence of these illegal agreements, resulting in more investment in health care solutions.  Those solutions could have addressed ailments for which there is currently no remedy, as well as more cost-effective and time-saving treatments for ailments which are able to be treated.

132.   Highmark's conspiracy with WPAHS and the consultant, and their scheme to cripple UPMC, have had the effect of foreclosing the entry and expansion of outside insurance competition.   If UPMC's reimbursement rates had not been artificially depressed at monopsonist levels, it could have invested more in its Heath Plan, providing an efficient alternative to consumers.   Also, had WPAHS been free to pursue contracts with outside insurers that were more advantageous than those it had with Highmark, that also would have facilitated the entry and expansion of those outside competitors.   A prime objective of the conspiracy has been for Highmark to utilize WPAHS for the purpose of blocking outside insurance entry.   Also, despite Highmark's public claims, WPAHS's role as an anticompetitive vehicle rather than a truly viable provider also had negative effects on provider side competition, as addressed below.

133.   In the absence of the Highmark-WPAHS conspiracy and broad-ranging scheme to foreclose outside insurance competition, Highmark's insurance competitors would have been able to enter and expand.   The resulting competition would have had a myriad of benefits to consumers and providers.   Just a few examples of resulting pro-competitive effects would have been increased insurance plan options to consumers, lower premiums for those options, increased reimbursements to providers which would be invested in better treatments, and greater customer service to both providers and consumers.

134.   The consolidation of Highmark's monopoly position, through its conduct and agreements with the members of the BCBSA, the consultant, and WPAHS, has allowed it to reap monopoly rents on both ends of its business.   Namely, Highmark has been able to raise prices on its insurance products, causing employers and their employees to pay higher premiums and imposing more onerous terms like higher co-pays.   It has likewise forced persons not purchasing insurance through an employer to pay even higher rates for even high-deductible plans.   On the

provider side, Highmark has been able to exercise monopsony power to drive reimbursements to physicians, hospitals, and other care providers to barely-sustainable levels.   This rate manipulation has discouraged new providers from establishing themselves in Western Pennsylvania, driven existing providers out of the market, and reduced the quality of care available to consumers.

135.    Highmark's multi-faceted scheme has resulted in anticompetitive effects which represent the classic evils of monopsony and monopoly.   By depressing purchases from providers, Highmark has been able to decrease provider output.   That decreased output hinders other insurers from entering and/or expanding, helping maintain Highmark's insurance monopolies.   Even if other insurers were to decide to enter, the viability of that effort would be hindered as Highmark has already locked in such low and effectively discriminatory reimbursement rates.   As a result, Highmark has driven up wait times and exacerbated existing challenges for prompt access to medical care.   There is no benefit to consumers to have their access to their providers delayed or impeded as a result of this scheme.

136.    No plausible pro-competitive efficiencies have counter-balanced this harm to competition as a result of Highmark's, WPAHS's, and the consultant's conduct.

137.    The end of the UPMC-Highmark commercial relationship, coupled with UPMC's agreements with outside insurers and Highmark's Affiliation Agreement with WPAHS, have combined to create a unique opportunity for competition in health care in Western Pennsylvania. If permitted, the market would benefit from the competition provided by: (i) Highmark/WPAHS, offering both medical care and insurance as an IDFS, independently and without UPMC; (ii) UPMC, offering both medical and insurance (from its own Health Plan) as an IDFS, independently and without WPAHS; and (iii) the four outside insurers, all offering plans

including *both* UPMC and WPAHS services and facilities in-network.  When all this comes to pass, there will be at least six effective competitors, all vying for the business of area customers with a wide variety of competitive offerings.  The long-run effect on area customers will be tremendously positive.  If on the other hand this is artificially stunted as a result of Highmark's and WPAHS's conduct, and if Highmark is allowed to try again in 2014 to coerce a contract renewal from UPMC, this opportunity to competition will be lost for the indefinite future.

## HARM TO THE PROVIDER MARKET

138.    Highmark's threats to physicians, community hospitals and other providers, made with WPAHS's and the consultant's coordinated support, have served to foreclose competition in the provider market.  With no real challenger to threaten Highmark's present monopoly in the relevant insurance markets, it has been able to threaten harm to providers who do not comply with its demands to cease any and all relations with UPMC.  WPAHS's true purpose, by the design of the conspiracy, has been to serve as the viable threat to independent providers that Highmark manufactured, rather than a well-run and efficient competitor in the provider market.

139.    The result of such threats is that Highmark, pursuant to its conspiracy with WPAHS and the consultant, has been able to restrain trade unreasonably in the market for inpatient services.  Consumers' access to provider services has decreased, or at the least, the cost consumers sustained to secure those services has increased.  As one example, if a patient's primary physician is an independent doctor, and that doctor normally refers the patient to UPMC for in-patient care at the patient's request, in the face of Highmark's threats the independent doctor is no longer free to do so.  So, the consumer either would have to endure the cost of switching to a primary physician who is not subject to such threats, or alternatively switch to a non-preferred provider.  There are a multitude of such examples, as they relate to how physicians

and/or patients have preferred to use UPMC facilities (whether via referral, specialized use, payment options) in the absence of any such improper threats. It is well recognized that this type of consumer harm is an actionable antitrust injury.

140.    Put another way, as a result of Highmark's threats made with WPAHS's support and the consultant's assistance, providers have no longer been free to distinguish themselves based on their relationships with one or more hospital systems because it must now favor Highmark's provider assets or else suffer the consequences. Consequently, consumers of healthcare have not reaped the benefits that free competition between providers would bring. Such benefits can come in a multitude of ways, including but not limited to quality based referrals between physicians, payment options for treatments not fully covered by insurance, and access to the most effective treatments available for a given condition.

141.    Accordingly, with no presently viable competition to challenge Highmark's insurance monopoly, Highmark has been able to continue effectively threatening providers with financial harm if they do not comply with Highmark's demands. As a result, Highmark, the consultant, and WPAHS have been able to effectively dictate where a significant portion of consumers can efficiently go for healthcare. Although many consumers may still desire to choose UPMC providers on the merits, Highmark has had the ability to credibly threaten harm to those providers if they do not disfavor UPMC as Highmark insists.

142.    Moreover, because of the conspiracy, an inefficient and incompetently run provider in WPAHS has been propped up artificially. Since WPAHS's inception, its primary function has not been the provision of meaningful provider side competition but, rather, serving as a lever for Highmark to maintain its insurance monopolies. One effect has been the

maintenance of inefficient excess capacity in the provider market. Health care consumers have had to pay for these unnecessary costs.

143.   In addition, reimbursement rates have also been depressed for all Western Pennsylvania providers as a direct consequence of Highmark's monopsonistic conduct which co-conspirator WPAHS has aided through its actions, notwithstanding the negative effects on its own reimbursement rates.   As explained above, Highmark's artificial maintenance of its insurance monopoly has also resulted in reduced output in the provider market.

144.   With Highmark in the position of controlling one Western Pennsylvania hospital system (WPAHS) and controlling another through long-term reimbursement rates (UPMC), it has achieved the power to coordinate pricing at both the provider level and in the sale of insurance.   This has enabled Highmark artificially to drive down reimbursement rates to healthcare providers while maintaining premiums to consumers at monopoly price levels.   Area providers and consumers have suffered accordingly.   The Center for Medicare & Medicaid Services (CMS) has already recognized the harm to competition which has resulted from Highmark being permitted to consolidate its monopoly power.   Upon learning that Highmark intended to acquire WPAHS, CMS mandated that Highmark divest its Medicare processing intermediary, recognizing, as even Highmark's CEO had to concede, the "conflict of interest" inherent in being both a competing provider and a claims manager for the wider market.

## HARM TO THE RELEVANT PURCHASING MARKETS

145.   Highmark's conduct, together with the aforementioned market allocation agreements and conspiracy with WPAHS and the consultant to prevent any and all insurance competition (including from UPMC and outside insurers), has had a direct impact on both the premiums consumers pay for insurance products, as well as the reimbursement rates paid by

Highmark to Western Pennsylvania providers. Insulated from competition, Highmark has been able to successfully maintain supracompetitive monopoly rates for the former, and subcompetitive monopsony rates for the latter. In the absence of such a blatant restraint on competition, neither phenomena would have been sustainable. The law recognizes that such damage to customers of and suppliers to the illegally conspiring parties have suffered a cognizable antitrust injury.

146.    The presence of up to 37 Blue competitors as well as non-Blue plans that would not have been hindered from competing with the Blues would have had immeasurable pro-competitive benefits to the relevant purchasing markets. Just a few of the benefits that would have resulted in the absence of foreclosed competition would be more innovative payment structures, better customer service, and increased transparency as to payor processes affecting providers (apart from the competitive reimbursement rates). As UPMC has seen most recently in the case of Highmark's abusive audits and cut-off communication protocols as to network issues, these effects of Highmark's monopsonization of the relevant purchasing markets are significant. With competition having been artificially cut off, there is little motivation for Highmark, the dominant payor, to improve. The ultimate result of these types of constraints is that providers are hindered from offering the best and most efficient healthcare solutions to consumers.

## INJURY TO UPMC FROM HIGHMARK'S AND WPAHS'S CONDUCT

147.    This injury to competition has harmed and threatens further direct harm to UPMC, coincident with the harms to competition described above.

148.    In the relevant insurance and purchasing markets, UPMC has sustained harm as a result of the hindered entry and expansion of outside insurers, including the Blues. In the absence of Highmark's conspiracies with WPAHS as well as other Blue plans, outside insurance

entry and expansion would have occurred and UPMC would have received higher reimbursement rates. UPMC has and continues to be victim to the classic evils of improperly retained monopsony power, including hindered entry and expansion of outside insurers, because provider output has been artificially restrained.

149.   Highmark's conspiracy with the BCBSA plans, the consultant, and WPAHS to foreclose insurance competition, as well as their long-standing campaign to cripple UPMC as an IDFS, has resulted in a direct injury to UPMC. In the absence of this conduct, UPMC would have received greater reimbursements from insurers, would have been able to enhance output on the provider side, and would not have been artificially stunted in its progress as an IDFS. While UPMC has made the best of its circumstances, its competitive potential has been hindered as a result of this overall course of unlawful conduct.

150.   Highmark's threats to physicians, community hospitals, and other providers, in tandem with WPAHS's and the consultant's participation, have resulted and continue to result in direct injury to UPMC in the provider market. Threatened providers have been hindered from being able to refer or otherwise treat patients at UPMC. UPMC has suffered and continues to suffer both financial losses and a loss of good will in the community as a result of these tactics.

151.   In addition, if Highmark, in tandem with WPAHS, is successful in improperly maintaining its insurance monopolies, national insurers Aetna, Cigna, United, and HealthAmerica will be precluded from expanding in the market, which will mean direct losses to UPMC as a result of its newly negotiated provider agreements. If the national insurers are unable to get a significant foothold in the relevant insurance and purchase markets, UPMC will suffer losses that will undermine its ability to remain a world-class medical institution. Consumers undoubtedly will suffer as a result of UPMC's inability to maintain its standards.

152.     The injuries to UPMC as a result of Highmark's and WPAHS's overall course of conduct are antitrust injuries because they directly stem from that which makes the activities unlawful.   The explicit purpose and effect of the market allocation agreements has been to foreclose insurance and purchase competition to which UPMC would have benefitted as a provider; the Highmark-WPAHS conspiracy as well as Highmark's other conduct to cripple UPMC has had the explicit focus of extinguishing UPMC's IDFS as a potential insurance competitor for the purpose of improperly maintaining Highmark's insurance monopolies; and the concerted threats to providers have impaired competition in the provider market at UPMC's expense.

153.     The future harm that UPMC has ample reason to expect from Highmark's and WPAHS's anticipated conduct requires injunctive relief from this Court.   The Defendants should be enjoined from continuing their wide-ranging abusive tactics, including but not limited to concerted threats, audits, demands, or public-campaigns that are designed to retain Highmark's monopolies in the relevant insurance and purchasing markets, or harm competition in the relevant provider market.   It is essential that Western Pennsylvania providers (including those now controlled by Highmark) be able to compete properly on the merits for the administration of care, rather than be influenced by improper forces.   Both providers and healthcare consumers must be given this relief in the best interest of the community.   Self-help is unlikely to be sufficient for UPMC to evade Highmark's and WPAHS's anticompetitive tactics.   To that end, any efforts by Highmark and its co-conspirators to coerce renewal of Highmark's agreement with UPMC beyond 2014 should also be enjoined.

## NO IMMUNITY

154.    None of the conduct alleged herein is subject to any express or implied immunity from the antitrust laws.

155.    The reimbursement rates paid by Highmark to UPMC for the purchase of health care provider services on behalf of commercial and Medicare Advantage plan insureds are not subject to approval by any state or federal authority.

156.    The horizontal market allocation agreements discussed herein do not constitute the business of insurance for purposes of any immunity from the antitrust laws.  These market allocation agreements do not have the necessary positive effect of transferring or spreading a policyholder's risk.  Nor does this horizontal arrangement between member plans form an integral part of the policy relationship between the insurer and the insured.  The member plans, through this illegal practice, are not engaging in a joint rate-making function.  Rather, each member plan is conducting its own business within its assigned territory, and through these series of agreements is insulating itself from competition from the other member plans.  Nor can these market allocation agreements be portrayed as a marketing decision, as independent potential and actual competitors agreeing not to compete with each other is not merely a marketing strategy.  At least one court has rejected the contention on summary judgment that the market allocation agreements by and between the member plans constitute the business of insurance for purposes of antitrust immunity.

157.    Nor is any of the other conduct alleged herein subject to any immunity.  None of the conduct qualifies as the "business of insurance" under applicable law.  In addition, the PID has not regulated, much less directed, Highmark's and WPAHS's anticompetitive conduct and has no authority to do so.

## CLAIMS

### Count I:  Monopolization in Violation of Sherman Act § 2, 15 U.S.C. § 2 (against Highmark)

158.    Plaintiff UPMC incorporates and realleges paragraphs 1 through 157 by reference.

159.    Highmark holds monopoly power over the market for the provision of commercial health insurance in Western Pennsylvania.

160.    Highmark has engaged and continues to engage in anticompetitive conduct with the object of maintaining and preserving its monopoly power.  This anticompetitive conduct has included, but is not limited to a multi-faceted scheme to cripple UPMC rather than competing on the merits, and depressed reimbursement rates.

161.    This conduct has injured and continues to threaten injury to UPMC in its business or property.

162.    Accordingly, UPMC seeks damages, to be trebled pursuant to federal antitrust law, and costs of suit, including reasonable attorney's fees for the injuries already sustained. These damages would include, but not be limited to, the increased reimbursement rates UPMC would have received in the absence of the anticompetitive conduct, and the profits which would have resulted had it not been artificially hindered as an IDFS.

163.    The expected injury from Highmark's future conduct would not be redressible by money damages and would therefore be irreparable.

164.    An injunction is appropriate to remedy the continuing violation, prevent irreparable harm to UPMC, and further the public interest in competitive health insurance markets.

### Count II:  Monopolization in Violation of Sherman Act § 2, 15 U.S.C. § 2 (against Highmark)

165.    Plaintiff UPMC incorporates and realleges paragraphs 1 through 164 by reference.

166.    Highmark holds monopoly power over the market for the provision of Medicare Advantage plans in Western Pennsylvania.

167.    Highmark has engaged and continues to engage in anticompetitive conduct with the object of maintaining and preserving its monopoly power.  This anticompetitive conduct has included, but is not limited to a multi-faceted scheme to cripple UPMC rather than competing on the merits, and depressed reimbursement rates.

168.    This conduct has injured and continues to threaten injury to UPMC in its business or property.

169.    Accordingly, UPMC seeks damages, to be trebled pursuant to federal antitrust law, and costs of suit, including reasonable attorney's fees for the injuries already sustained. These damages would include, but not be limited to, the increased reimbursement rates UPMC would have received in the absence of the anticompetitive conduct, and the profits which would have resulted had it not been artificially hindered as an IDFS.

170.    The expected injury from Highmark's future conduct would not be redressible by money damages and would therefore be irreparable.

171.    An injunction is appropriate to remedy the continuing violation, prevent irreparable harm to UPMC, and further the public interest in competitive health insurance markets.

### Count III:  Attempted Monopolization in Violation of Sherman Act § 2, 15 U.S.C. § 2 (against Highmark)

172.    Plaintiff UPMC incorporates and realleges paragraphs 1 through 171 by reference.

173.    Defendant Highmark has engaged and continues to engage in anticompetitive conduct.

174.    This conduct has been undertaken with the specific intent of monopolizing the market for the provision of commercial health insurance in Western Pennsylvania.

175.    Due to its relentless campaign of coercion, retribution, and public pressure, Highmark's scheme has had a dangerous probability of success.  This is especially so in light of its already dominant position in the market, controlling over 65% of the Western Pennsylvania commercial health insurance market.

176.    This conduct has injured and continues to threaten injury to UPMC in its business or property.

177.    Accordingly, UPMC seeks damages, to be trebled pursuant to federal antitrust law, and costs of suit, including reasonable attorney's fees for the injuries already sustained. These damages would include, but not be limited to, the increased reimbursement rates UPMC would have received in the absence of the anticompetitive conduct, and the profits which would have resulted had it not been artificially hindered as an IDFS.

178.    The expected injury from Highmark's future conduct would not be redressible by money damages and would therefore be irreparable.

179.    An injunction is appropriate to remedy the continuing violation, prevent irreparable harm to UPMC, and further the public interest in competitive health insurance markets.

### Count IV:  Attempted Monopolization in Violation of Sherman Act § 2, 15 U.S.C. § 2 (against Highmark)

180.    Plaintiff UPMC incorporates and realleges paragraphs 1 through 179 by reference.

181.    Defendant Highmark has engaged and continues to engage in anticompetitive conduct.

182.    This conduct has been undertaken with the specific intent of monopolizing the market for the provision of Medicare Advantage plans in Western Pennsylvania.

183.    Due to its relentless campaign of coercion, retribution, and public pressure, Highmark's scheme has a dangerous probability of success.  This is especially so in light of its already dominant position in the market, controlling over 50% of the Western Pennsylvania Medicare Advantage health insurance market.

184.    This conduct has injured and continues to threaten injury to UPMC in its business or property.

185.    Accordingly, UPMC seeks damages, to be trebled pursuant to federal antitrust law, and costs of suit, including reasonable attorney's fees for the injuries already sustained. These damages would include, but not be limited to, the increased reimbursement rates UPMC would have received in the absence of the anticompetitive conduct, and the profits which would have resulted had it not been artificially hindered as an IDFS.

186.    The expected injury from Highmark's future conduct would not be redressible by money damages and would therefore be irreparable.

187.    An injunction is appropriate to remedy the continuing violation, prevent irreparable harm to UPMC, and further the public interest in competitive health insurance markets.

### Count V:   Conspiracy in Unreasonable Restraint of Trade in Violation of Sherman Act § 1, 15 U.S.C. § 1 (against Highmark and WPAHS)

188.    Plaintiff UPMC incorporates and realleges paragraphs 1 through 187 by reference.

189.    Defendants Highmark and WPAHS have engaged in a continuing conspiracy with the purpose and effect of maintaining Highmark's monopolies in the Western Pennsylvania health insurance markets.   Highmark has agreed to favor WPAHS over UPMC in terms of compensation and other financial treatment, and in return WPAHS has agreed not to contract with any outside insurer on more favorable terms than Highmark.

190.    The purpose and probable effect of the continuing conspiracy is to raise the cost of insurance to Western Pennsylvania consumers, eliminate or marginalize all competitors, and raise barriers to entry in the relevant insurance markets.

191.    This conduct has injured and continues to threaten injury to UPMC in its business or property.

192.    Accordingly, UPMC seeks damages, to be trebled pursuant to federal antitrust law, and costs of suit, including reasonable attorney's fees for the injuries already sustained. These damages would include, but not be limited to, the increased reimbursement rates UPMC would have received in the absence of the anticompetitive conduct, and the profits which would have resulted had it not been artificially hindered as an IDFS.

193.    The expected injury from Defendants' future conduct would not be redressible by money damages and would therefore be irreparable.

194.    An injunction is appropriate to remedy the continuing violation, prevent irreparable harm to UPMC, and further the public interest in competitive health insurance markets.

### Count VI:  Conspiracy in Unreasonable Restraint of Trade in Violation of Sherman Act § 1, 15 U.S.C. § 1 (against Highmark and WPAHS)

195.    Plaintiff UPMC incorporates and realleges paragraphs 1 through 194 by reference.

196.    Defendants Highmark and WPAHS have entered into a continuing conspiracy with the purpose and effect of restraining competition unreasonably in the provision of inpatient care.

197.    As part of this continuing conspiracy, Defendant Highmark has assumed effective control over WPAHS's provider assets.

198.    Armed with those assets, Highmark has already begun to engage in intimidation and harassment tactics to threaten providers that if they do not comply with its demands, particularly with regard to their treatment of UPMC, they will suffer financial harm.  One aspect of the Highmark-WPAHS conspiracy has been for Highmark to make such threats for WPAHS's potential benefit.  The co-conspirator consultant has also been retained by Highmark to execute these threats.

199.    As one example, Highmark, through the consultant, threatened the urgent care center at the Washington Hospital that if it does not terminate its joint venture with UPMC, it will steer its insureds to other WPAHS providers, such as Canonsburg Hospital.

200.    The purpose and probable effect of these continuing conspiracies is to raise the cost of inpatient care to Western Pennsylvania consumers, eliminate or marginalize all competitors, and raise barriers to entry.

201.    This conduct has injured and continues to threaten injury to UPMC in its business or property.

202.    Accordingly, UPMC seeks damages, to be trebled pursuant to federal antitrust law, and costs of suit, including reasonable attorney's fees for the injuries already sustained. These damages would include, but not be limited to, the increased revenue it would have received from admissions and referrals it would have received in the absence of such conduct.

203.    The expected injury from Defendants' future conduct would not be redressible by money damages and would therefore be irreparable.

204.    An injunction is appropriate to remedy the continuing violation, prevent irreparable harm to UPMC, and further the public interest in competitive health insurance markets.

### Count VII:  Conspiracy to Monopolize in Violation of Sherman Act § 2, 15 U.S.C. § 2 (against Highmark and WPAHS)

205.    Plaintiff UPMC incorporates and realleges paragraphs 1 through 204 by reference.

206.    Defendants Highmark and WPAHS have entered into a continuing agreement with the purpose and effect of maintaining Highmark's monopolies in the Western Pennsylvania health insurance markets.  Highmark has agreed to favor WPAHS over UPMC in terms of compensation and other financial treatment, and in return WPAHS has agreed not to contract with any outside insurer on more favorable terms than Highmark.

207.    In furtherance of the continuing conspiracy, Defendants have engaged in a broad range of conduct, including but not limited to the creation of Community Blue, and threatening UPMC that if it does not comply with Highmark's demands, its insureds will be steered to WPAHS's facilities.  This and other conduct has been undertaken with the specific intent of monopolizing the relevant insurance markets.

208.   Due to this relentless campaign of coercion, retribution, and public pressure, Defendants' scheme has a dangerous probability of success.  This is especially so in light of Highmark's already dominant position in the relevant insurance markets, controlling over 65% of the Western Pennsylvania commercial health insurance market, and over 50% of the Western Pennsylvania Medicare Advantage health insurance market.

209.   The purpose and probable effect of the continuing conspiracy is to raise the cost of insurance to Western Pennsylvania consumers, eliminate or marginalize all competitors, and raise barriers to entry in the relevant insurance markets.

210.   This conduct has injured and continues to threaten injury to UPMC in its business or property.

211.   Accordingly, UPMC seeks damages, to be trebled pursuant to federal antitrust law, and costs of suit, including reasonable attorney's fees for the injuries already sustained. These damages would include, but not be limited to, the increased reimbursement rates UPMC would have received in the absence of the anticompetitive conduct, and the profits which would have resulted had it not been artificially hindered as an IDFS.

212.   The expected injury from Defendants' future conduct would not be redressible by money damages and would therefore be irreparable.

213.   An injunction is appropriate to remedy the continuing violation, prevent irreparable harm to UPMC, and further the public interest in competitive health insurance markets.

### Count VIII: Contract, Combination, or Conspiracy in Restraint of Trade in Violation of Sherman Act § 1, 15. U.S.C. § 1 (against Highmark)

214.   Plaintiff UPMC incorporates and realleges paragraphs 1 through 213 by reference.

215.    Defendant Highmark and the 37 other member plans of the BCBSA, by and through their officers, directors, employees, agents, or other representatives, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, had an agreement in restraint of trade to allocate markets, reduce competition, restrict output, and depress reimbursement rates to providers in Western Pennsylvania, including UPMC.

216.    UPMC has been injured in its business and property by reason of this unlawful combination, and has been paid lower reimbursement rates for the delivery of provider services to commercial insureds than it otherwise would have been paid in the absence of this conduct. This injury is of the type the federal antitrust laws were designed to prevent and flows from that which makes Defendant's conduct unlawful.

217.    Accordingly, UPMC seeks damages, to be trebled pursuant to federal antitrust law, and costs of suit, including reasonable attorney's fees for the injuries already sustained.

218.    The expected injury from Highmark's future conduct pursuant to this conspiracy would not be redressible by money damages and would therefore be irreparable.

219.    An injunction is appropriate to remedy the continuing violation, prevent irreparable harm to UPMC, and further the public interest in competitive health insurance markets.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff UPMC respectfully requests that this Court:

a.    Adjudge and decree that the above-described conduct encompassed by Counts I-IV and VII above violates and continues to threaten a violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

b.      Award UPMC damages in the form of three times the amount by which it was injured pursuant to Counts I-IV and VII;

c.      Issue an injunction pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, prohibiting and restraining Defendants Highmark and WPAHS from engaging in any future initiative to cripple UPMC while attempting to avoid competition on the merits;

d.      Order Defendant Highmark to pay UPMC's reasonable costs and attorneys' fees in bringing and maintaining Counts I-IV of this action pursuant to 15 U.S.C. § 26;

e.      Order Defendants Highmark and WPAHS to pay UPMC's reasonable costs and attorneys' fees in bringing and maintaining Count VII of this action pursuant to 15 U.S.C. § 26;

f.      Adjudge and decree that the above-described conduct encompassed by Counts V-VI above violates and continues to threaten a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

g.      Award UPMC damages in the form of three times the amount by which it was injured pursuant to Counts V-VI;

h.      Issue an injunction pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, prohibiting and restraining Defendants Highmark and WPAHS from:

i.   Agreeing to favor WPAHS over UPMC in its compensation and other financial treatment;

ii.  Threatening UPMC, implicitly or explicitly, that, if it does not comply with Highmark's demands, patients will be steered to Highmark's provider assets;

iii. Contracting with UPMC beyond the expiration of the Highmark's and UPMC's current contracts on December 31, 2014 except with

regard to specific facilities and patients already identified in the parties' preliminary agreement; and

    iv.   Engaging in any conduct pursuant to their conspiracy, the purpose or effect of which is to impair competition in the markets for health insurance or provider services

i.     Order Defendants Highmark and WPAHS to pay UPMC's reasonable costs and attorneys' fees in bringing and maintaining Counts V-VI of this action pursuant to 15 U.S.C. § 26;

j.     Adjudge and decree that the above-described conduct encompassed by Count VIII above violates and continues to threaten a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

k.     Award UPMC damages in the form of three times the amount by which it was injured pursuant to Count VIII;

l.     Permanently enjoin Highmark from entering into, or from honoring or enforcing, any agreements that restrict the territories or geographic areas in which any BCBSA member plan may compete;

m.    Order Defendant Highmark to pay UPMC's reasonable costs and attorneys' fees in bringing and maintaining Count VIII of this action; and

n.     Award any further relief it may deem just and proper.

## DEMAND FOR JURY TRIAL

UPMC demands a trial by jury on all issues triable by jury.


Dated:  May 23, 2012                    Respectfully submitted,


    /s/ Paul H. Titus
PAUL H. TITUS (PA ID. 01399)
GEORGE E. MCGRANN (PA ID. 25604)
EMILY M. AYOUB (PA ID. 204891)
*Schnader Harrison Segal & Lewis LLP*
120 Fifth Avenue, Suite 2700
Pittsburgh, PA 15222-3001
(412) 577-5224 (Telephone)
(412) 765-3858 (Facsimile)

JONATHAN M. JACOBSON (NY-JJ-0605)
DAVID H. REICHENBERG
MICHAEL S. WINOGRAD
*Wilson Sonsini Goodrich & Rosati*
1301 Avenue of the Americas
New York, NY  10019
(212) 497-7700 (Telephone)
(212) 999-5899 (Facsimile)

SCOTT A. SHER
*Wilson Sonsini Goodrich & Rosati*
1700 K Street, N.W.
Washington, DC  20006
(202) 973-8800 (Telephone)
(202) 973-8899 (Facsimile)


*Attorneys for Plaintiff UPMC*